UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| LOUIS AND KAREN METRO | ) | |
| FAMILY, LLC, and | ) | |
| SOUTHERN OHIO PIZZA, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 4:06-cv-177-WGH-DFH |
| | ) | |
| LAWRENCEBURG CONSERVANCY and | ) | |
| CITY OF LAWRENCEBURG, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT, CONCLUSIONS
OF LAW AND DECISION**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, pursuant to the parties' consent to refer this matter to the Magistrate Judge found in the Parties' Case Management Plan and the Order of Reference entered by Chief Judge David F. Hamilton on April 3, 2007.  (Docket Nos. 15, 16).  A bench trial was held in New Albany, Indiana, on March 10 and 11, 2009.  Plaintiffs Louis and Karen Metro Family, LLC ("Metro Family") and Southern Ohio Pizza Inc. ("SOP") were represented by counsel, Joshua Taylor Rose and Susan Lynn Williams.  Defendant Lawrenceburg Conservancy ("LCD") was represented by counsel, Richard A. Butler, William C. Moyer, and Stephen Naville.  Defendant City of Lawrenceburg ("City") was represented by counsel, Joseph Wilber Votaw, III.

The Magistrate Judge, being duly advised, hereby enters his Findings of Fact, Conclusions of Law and Decision:

## Findings of Fact

1. Metro Family is a limited liability company organized under the laws of the State of Ohio, with its principal place of business in Ohio, and is owned and operated by Lewis and Karen Metro, residents of Ohio. Metro Family is a family-held LLC and was set up to pass real estate and future ownership to the Metro children.

All members of Metro Family were residents of Ohio as of the date of the filing of the Complaint in this case. Metro Family leases property to SOP, who operates Domino's Pizza franchises owned by Metro Family.

SOP is a corporation organized under the laws of the State of Ohio, with its principal place of business in Ohio.

2. LCD is a conservancy district created pursuant to Indiana statutes for the purpose of flood control, including building floodwalls/levees. LCD was created by the State of Indiana Natural Resources Commission, as provided in Indiana Code 14-33.

The City is a municipality located in Dearborn County, Indiana.

3. As a result of a 1997 flood, beginning in 2000, the City and LCD began discussions concerning a project known as the Westside Flood Protection Project which involved construction of a levee (the "Levee Project").

4. The City and LCD entered into an Extension of Revenue Sharing Agreement, dated December 21, 2000, whereby the City and LCD agreed to jointly fund the Levee Project until the project was completed. Funding was

agreed to be largely derived from gaming revenues that the City and LCD received and were to receive from a Lawrenceburg casino boat.  (See Exhibit 3).

5.   On January 25, 2001, LCD notified Metro Family that LCD intended to acquire through eminent domain a 1.77-acre parcel of land owned by Metro Family located at 8-12 Beilby Road in Lawrenceburg, Dearborn County, Indiana ("the Property").  (See Exhibit 6).

6.   The sole purpose for obtaining the Property was to enable LCD to construct the Levee Project, and there was no other public purpose for the taking at that time.

7.   An appraisal for the Property was conducted by Jeffrey D. Thomas, a licensed appraiser, on November 1, 2001.  (Exhibit 72).

8.   Thomas concluded that the fair market value of the Property was $417,000.

9.   In conducting the appraisal to determine the Property's value, Mr. Thomas used the comparable sales approach, cost approach, and income approach to arrive at the $417,000 fair market figure.

10.  On March 22, 2001, LCD sent to Metro Family an Acquisition Offer for the Property pursuant to I.C. 32-24-1-5.  (See Exhibit 7).

11.  Metro Family, through its attorney, Jennifer Ball Wolfe, did not agree to accept the offer as tendered and sought to negotiate additional consideration in a series of correspondence and conversations between Ms. Wolfe and Grant Hughes, as LCD's project manager.  (See Exhibits 8, 9, 10, 11, 13, 14 and 16).

Wolfe also corresponded with William Ewan, attorney for LCD.  (Exhibits 14, 16).  These negotiations were by mutual agreement and took place between March 29, 2001, and July 3, 2001.

12.  On July 19, 2001, Ms. Wolfe submitted a formal counter offer to LCD. (Exhibit 20).  In order to avoid litigation and further eminent domain proceedings, Metro Family agreed to accept the $417,000 offer, along with an option to purchase the land back and a "guarantee" of Metro Family's right to exercise the option within eighteen (18) months of LCD taking possession of the Property.

13.  On July 30, 2001, Mr. Hughes drafted a response which states, "The LCD accepts your counter offer of July 19, 2001, with the above exceptions [not material to this matter] and the understanding that the Settlement of Business interruption Expense will need to be supported with proper documentation." (Exhibit 21).

14.  On August 3, 2001, Mr. Ewan sent to Metro Family documents showing city approval of funding for the project.  (Exhibit 22).

15.  Mr. Ewan began drafting the agreement between LCD and Metro Family to resolve the dispute in lieu of litigation through eminent domain. (Exhibits 24, 25; testimony of Ewan).

16.  On October 25, 2001, Mr. Ewan emailed a draft of the proposed agreement to Ms. Wolfe.  (Exhibit 27).  Ms. Wolfe reviewed the document. (Exhibits 26, 27, 28 and 29).

17.   The final version of the Agreement was signed by the parties on

October 31, 2001, and contains the following relevant provisions:

2.   At the time of closing, which shall occur on or before November 30, 2001, District shall execute an irrevocable Option in favor of Metro wherein Metro shall have the right to purchase 0.827 acres of the real estate described in Exhibit A and the adjoining 0.555 acres (formerly part of the Taylor property) for a purchase price of Two Hundred Sixty-Nine Thousand Four Hundred Ninety ($269,490.00) Dollars, which Option shall specify that the purchase shall be subject to a new easement in favor of District for the location, repair, maintenance and replacement of its facilities to be constructed on said real estate; a new easement in favor of City for the location, repair, maintenance and replacement of its new pumping station to be constructed on said real estate; existing easements for roads in favor of the State of Indiana; existing flowage easements in favor of the United States of America; other easements of record; and riparian rights of Tanner's Creek, and shall be exercisable for a period of eighteen (18) months commencing with the date written notice of Substantial Completion of the District's facilities is given by District to Metro by registered mail, certified mail, acknowledged facsimile, or acknowledged email transmission. The Option shall further stipulate that the property be excavated and left by the District in a reasonable manner to facilitate Metro's plans to rebuild a facility.

* * * * *

5.   Metro and Domino's agree that possession shall be given District on or before December 1, 2001, and Metro agrees that his tenants will be out on or before November 30, 2001.  The District agrees to indemnify and hold harmless Metro, his heirs and assigns, for any liability arising out of the early termination of his tenants' leases.

6.   District and Domino's agree that Business Relocation Payments shall be in the total amount of One Hundred Fifty-Three Thousand ($153,000.00) Dollars.  Business Relocation Payments are to be made by the District pursuant to the provisions of Indiana Code 8-23-17-12 and 8-23-17-13 and Chapter 4 of the *"Acquisition Handbook"* published by HUD (including May 1996 CH-4), a copy of which is attached hereto and made a part hereof as Exhibit B.  At the time of closing, fifty (50%) percent of said amount, or the total of all documented Business Relocation Expenses, whichever is greater, will be payable to Domino's.  Acceptable Documentation shall be written third party quotes, leases, or receipts for any item qualifying

-5-

under Exhibit B.  Acceptable Documentation shall also include official correspondence from Domino's Piazza [sic] corporate office specifying requirements.  Acceptable Documentation of lease expenses for Domino's current lease shall be business records demonstrating payments by Domino's to Metro for the current location.  Acceptable Documentation shall include plans, specifications, photographs, inventories, equipment lists, profit and loss statements, audited financial statements, or any other reasonable method which will provide documentation to the District permitting it to withstand an audit by the Indiana State Board of Accounts.

\* \* \* \* \*

8.  At the time of closing and upon presentation of Acceptable Documentation as set forth in paragraph 2 above, District shall pay to Metro a sum equal to the difference in his lease payments from his current location and his new location for a period of eighteen (18) months (i.e. the difference x 18).

After such initial payment of lease expenses is made, it is the District's intent to impose certain restrictions on Metro's payments with regard to lease expenses.  Accordingly, at the end close [sic] of the eighteen (18) month period described above, if Metro has not exceeded a total of $153,000.00 in payments as set forth in paragraph 7 above, he may submit Acceptable Documentation for additional payments in lease expenses.  At such time and upon such occurrence, if Metro exercises his option to purchase back District property, then he shall receive payments equal to the difference between Fifteen ($15.00) Dollars per square foot and the amount of his current least rate on a per square foot basis for an additional forty-two (42) months or until such time as the $153,000.00 is paid, whichever comes first.  In the event Metro does not exercise his option to purchase back District property, then he shall receive, upon the presentation of Acceptable Documentation, lease expense payments equal to the difference between his current location and his new location for a period of forty-two (42) months or until such time as the $153,000.00 is paid, whichever comes first.

\* \* \* \* \*

11.  Should Metro not exercise the Option and Domino's not occupy a new facility owned by Metro, but remain in its temporary location or relocate to another permanent location within the City of Lawrenceburg, then the Business Relocation Expenses payable pursuant to this Agreement shall still be paid upon receipt of

-6-

Acceptable Documentation.  Should Metro not exercise the Option
and Domino's not remain within the City of Lawrenceburg, then no
further payments shall be made.

* * * * *

14.  This Agreement constitutes the entire agreement between
the parties and replaces any prior agreements, whether written or
oral, and shall only be modified by a document in writing signed by
all the parties hereto.

(Exhibit 2).

18.  The Agreement did not explicitly address whether the option could be
exercised by Metro Family if the Levee Project was not completed.

19.  As of the October 31, 2001, date of the execution of the Agreement,
the Agreement was not ambiguous because at that time both Metro Family and
LCD reasonably believed that funding for the project was in place, the project
was commenced and would be completed, and that Metro Family would be able
to exercise its option because there would be sufficient land available behind an
appropriate levee to rebuild.  At this time neither party contemplated that the
Levee Project would not be completed.

20.  Although LCD had received communications from some City Council
members inquiring about the project, the LCD, through Mr. Ewan, did not
consider them serious threats to completion of the Levee Project.  (Testimony of
Ewan; testimony of Lorey).  No information about the City Council  members'
concerns were ever communicated to Metro Family.

21.  The attorneys for Metro Family prepared the Deed conveying the
Property from Metro Family to LCD.

-7-

22.   On November 30, 2001, the chairman of LCD executed an Option for the Purchase of Real Estate ("the Option").   (See Exhibit 1).

23.   The Option provided, in pertinent part:

1.      The purchase price shall be the sum of **Two Hundred Sixty-Nine Thousand Four Hundred Ninety ($269,490.00) Dollars** to be paid in full at the time of closing.

3.      This Option shall be exerciseable [sic] by Metro for a period of **eighteen (18) months** commencing with the date written notice of Substantial Completion of the District's facilities is given by the District to Metro by registered mail, certified mail, acknowledged facsimile, or acknowledged email transmission.

(Exhibit 1).

24.   Prior to the execution of the Option, Wolfe reviewed and approved of the Option language via email communications with counsel for LCD.   The emails from Metro Family's attorney to the attorney for LCD read, in part:   "The option agreement looks fine.   I will forward to Mr. Metro to review as well, but don't anticipate any problems as it is very concise and succinct as to what was already agreed."   (Exhibits 32, 33).

25.   The original Option was provided to Metro Family at the closing on November 30, 2001.

26.   At the time the Option was executed, LCD intended to use the Property for construction of the Levee Project and for no other purpose.

27.   At the time of the execution of the Option on November 30, 2001, the Option was not ambiguous because both parties reasonably believed that funding for the Levee Project was in place, that the project was commenced and would be completed, and that Metro Family would be able to exercise its Option

because there would be sufficient land available behind an appropriate levee to rebuild.

At this time, neither party contemplated that the Levee Project would not be completed.  Although LCD had received communications from some City Council members inquiring about the project, LCD did not consider them serious threats to completion of the Levee Project, and no information about the City Council members' concerns was communicated to Metro Family at this time.

28.  On January 28, 2002, the Lawrenceburg Common Council passed a resolution withdrawing its funding from the Levee Project.  (Exhibits 34, 35).

29.  Without City funding, LCD chose not to complete the Levee Project. (Testimony of Ewan; testimony of Lorey).  The Levee Project could not be completed because the ballpark "cost of the project" was between $29 and $32 million.  LCD had only $20 million available for the project at that time, and LCD members did not wish to raise taxes or levies to complete the project at that time.

30.  The action of the City to withdraw funding was an event not contemplated by either party to the Agreement or Option prior to January 28, 2002; that action caused the essential purpose of the Agreement to fail. Specifically, the essential purpose of the Agreement was to exercise the power of eminent domain to obtain the Property solely for the purpose of constructing the levee.

31.  Under Indiana law, an event occurring after the execution of a written contract which causes the essential purpose of the contract to fail, and which

was not reasonably anticipated by the parties, creates a latent ambiguity in the document.

32.  Where there is a latent ambiguity, the court may use extrinsic evidence to determine the intent of the parties.  Here, the following evidence supports the conclusion that Metro Family was to be entitled to exercise its Option if the Levee Project did not reach completion:

(a)   Exhibit 11, a letter from Jennifer Ball to Grant Hughes, states, in pertinent part:  "We do not want to waste your time or our time in further preparing a proposal if the committee is conceptually opposed to the idea [the idea is "returning to the property]. . . .  Assuming the committee is not opposed to Mr. Metro returning to the property, I will work with Mr. Ewan to prepare the proposal to fit the statutory requirements."

(b)   Exhibit 13, a letter from Jennifer Ball to Grant Hughes, states, in pertinent part:  "The Mayor is supportive of keeping Mr. Metro in his current location and will work with local officials to approve the necessary variances for signage and parking.  It is estimated 10-15 parking spaces will be needed and Mr. Metro's current signage will remain the same size."
Paragraph 4 in that letter states:  "As a condition for Mr. Metro maintaining ownership of his land in this eminent domain action, Mr. Metro must make an offer to purchase an additional .55 acres from the Lawrenceburg Conservancy."

(c)   The fact that the Option required Metro Family to obtain additional land also in the floodplain would not be necessary if the parties did not anticipate his return to the same location.

(d)   Exhibit 16, a letter from Jennifer Ball to Grant Hughes, states, in pertinent part:  "Based upon the assumption that he can move back onto the property and build a new facility, we propose the following to the Conservancy for the taking of Mr. Metro's property and its impact on the Domino's Pizza business."
Paragraph 3 on page 2 of that letter unequivocally states:  "When Lawrenceburg completes its work on the flood wall, Mr. Metro will exercise his right to buy back the land pursuant to the option to purchase agreement.  This option to purchase agreement shall entitle Mr. Metro access to the property when the floodwall construction is completed so he may begin construction on a new facility as soon as possible."

Paragraph 4 on page 2 of that letter states: "Based upon our earlier discussions, the city of Lawrenceburg will cooperate with Mr. Metro to provide the necessary set back variances, permits, etc. to put him in the place he would have been in had this eminent domain action not occurred (i.e. maintain the existing status quo)."

The letter goes on to state: "The purpose of the afore-mentioned is to allow the Conservancy to use the land as necessary to build the floodwall, compensate Mr. Metro for destroying his building and using his land such that Mr. Metro can return to his original site, keep his Domino's Pizza in Lawrenceburg, and minimize the business damages which would otherwise be paid to Mr. Metro and Domino's in a typical eminent domain action . . . ."

(e)   Exhibit 20, the counter offer of Mr. Metro, contains the following language at paragraph 2: "The Conservancy will guarantee Mr. Metro's right to exercise the option [to] purchase the property, as descried [sic] in paragraph one above, within eighteen (18) calendar months of the Conservancy's possession of the property."

(f)   In Exhibit 26 and Exhibit 1, the Option, the parties negotiated that after the building was taken, the land would be returned "in a reasonable manner to facilitate rebuilding."

(g)   To the extent LCD believed this property was in a floodplain and could not be built upon if the project was not completed, no member of LCD ever communicated to Metro Family in any way that the Option could not be exercised until at least August of 2005. (Exhibits 50, 53). The failure to explicitly tell Metro Family that it could not rebuild because of the existence of other floodplain issues indicates LCD's belief that Metro Family would be entitled to rebuild, even if the building remained within a floodplain.

(h)   Exhibit 72, the Appraisal, indicates that while part of the property lies within the 100-year floodplain, the building did not. LCD's own appraiser does not reflect the fact that no rebuilding could occur after the taking.

(i)   Exhibit 37, a letter from Grant Hughes to Jennifer Wolfe, states: "If nothing changes, we can discuss how to handle the option at that time." Exhibit 37 is dated February 11, 2002, after the City has withdrawn funding.

(j)   Exhibit 40, is an email dated April 17, 2003. It states by Mr. Ewan, the attorney, that "[t]he question of the option is still up in the air."

(k)   Exhibit 45, a letter of William Ewan to Jennifer Wolfe, states: "Under the terms of Mr. Metro's option, the time during which he may exercise that option commences when the project is

complete." This letter, dated December 4, 2003, does not advise Metro Family that it may not exercise its option because the City has withdrawn funding.

33.   LCD continued to make plans for the completion of the Levee Project after the City withdrew funding.  (Exhibit 45; testimony of Lorey).

34.   LCD has taken no efforts to enforce the Extension of Revenue Sharing Agreement.  (Exhibit 3; testimony of Lorey and Ewan).

35.   LCD continued to express to Metro Family the hope that the project would be resumed or completed and that it would be able to continue to exercise its Option in February 2002 (Exhibits 37, 39, 40) and continuing as late as December 4, 2003 (Exhibit 45).

36.   Metro Family relied upon the representations as described in Finding of Fact 35 in allowing its building to be demolished, which occurred sometime after February 2002.  (Exhibit 37).

37.   As to Mr. Taylor's opinion, the court concludes that his opinion as to lost stream of income is too speculative to be given any weight.  The court concludes this because he did not submit a specific report detailing his calculations; that his testimony as to how he compiled this information was very vague, including the fact he could not name certain people that he talked to or the name of the assessor; that he simply took an assumed amount of ten percent (10%) of costs from the revenue stream and applied it to his calculations; and that he did not reduce the matter to present value.

In addition, the testimony of Mr. Thomas indicates that there are more specific calculations that can be made in an attempt to come up with an

appropriate opinion as to the loss of the income stream.  The court finds that it can give no weight to Mr. Taylor's opinion.

38.  As to Mr. Metro's testimony, he was not specific and rendered no specific opinion as to the fair market value of the Property on the date of taking, nor to the damage that was sustained by him from the destruction of his building.

### Conclusions of Law as to Count Two, Breach of Option Contract

1.  In order to maintain an action for breach of contract, a plaintiff must show:  (1) the existence of a contract; (2) the defendant's breach of the contract; and (3) damages caused by the breach.  *Collins v. McKinney,* 871 N.E.2d 363, 370 (Ind.Ct.App. 2007).

2.  Indiana follows the four corners rule; namely, that extrinsic evidence is not admissible to add to, vary, or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction.  A document is not ambiguous simply because parties disagree about a term's meaning.  Language is ambiguous only if reasonable people could come to different conclusions as to its meaning.  *Cook v. Adams County Plan Com'n,* 871 N.E.2d 1003, 1007 (Ind.Ct.App. 2007).

3.  A patent ambiguity is apparent from a look at the face of the contract. It arises from indefinite or confusing language within the instrument itself. *Simon Property Group, L.P. v. Michigan Sporting Goods Distributors, Inc.,* 837 N.E.2d 1058, 1070-71 (Ind.Ct.App. 2005).

4.  A latent ambiguity on the other hand is not apparent until it becomes time to implement the contract.  *Id.* at 1071.  While a patent ambiguity raises a question of law, a latent ambiguity raises questions of fact that must be resolved by the fact finder.  *Id.* at 1071.

5.  In this case, a decision by the City to revoke its prior commitment to fund the Levee Project created a latent ambiguity in the document between Metro Family and LCD.  Specifically, that decision (made after the signing of the contract) rendered ambiguous the following language:

> [The Option] shall be exercisable for a period of eighteen (18) months commencing with the date written notice of Substantial Completion of the District's facilities is given by District to Metro. . . .

(Exhibit 2, ¶ 2).

6.  Under I.C. 14-33-1-1, LCD exists for the purpose of maintaining flood control projects.  It acquired this Property solely for the purpose of the Levee Project and for no other purpose.  When the Levee Project did not come to fruition, LCD had no other need or use for the Metro Family Property.

7.  Given that LCD had no need of the Property if the Levee Project was not going forward, the language "Substantial Completion of the District's facilities" in the Option (Exhibit 1) can reasonably be understood to mean either the time in which the Levee Project is actually completed or the time at which a decision is made not to proceed with the Levee Project.

8.  Metro Family was entitled to exercise its Option commencing on the date by which LCD determined not to complete the Levee Project by conveying

-14-

the Property to the City.  By refusing Metro Family's request to exercise the Option, LCD breached its Option contract.

9.  The City took title to the Property knowing that it was subject to the claims of Metro Family.

10.  Metro Family and SOP have not proven that they have sustained any monetary damages, but they have proven that they sustained the loss of the right to exercise the Option.

11.  Indiana recognizes the "extreme equitable" remedy of reformation. *Wedel v. American Electric Power Service Corp.,* 681 N.E.2d 1122, 1138 (Ind.Ct.App. 1997).  To obtain this remedy, the party seeking reformation must establish the true intentions of the parties to an instrument, that a mistake was made, that the mistake was mutual, and that the instrument does not reflect the true intentions of the parties.  In particular, in Indiana, reformation may only be had for a mistake of fact.

12.  In this case, Metro Family has established that:  (a) the true intentions of the parties to this instrument were that both parties reasonably believed the Levee Project was fully funded and would be completed, and that Metro Family would exercise the Option and return to business at its prior location; (b) a factual mistake was made because the Levee Project was not fully and completely funded; (c) both parties mutually believed the project was completely funded; and (d) the instrument does not reflect the true intentions of the parties. Because the parties were mutually mistaken about the fact that the project was fully funded, reformation is appropriate in these circumstances.

-15-

## Conclusions of Law as to Count Three,
## Promissory Estoppel

13.  Indiana recognizes the equitable *contractual* claim of promissory

estoppel.  *Pepsi-Cola General Bottlers, Inc. v. Woods,* 440 N.E.2d 696 (Ind.Ct.App.

1982).  This doctrine sounds in contract, is not a tort, and does not require the

filing of a Tort Claim Notice.  In order to avail itself of the doctrine of promissory

estoppel, Metro Family must prove:

    (a)    a promise which the promisor should reasonably expect to
             induce action or forbearance of a definite and substantial
             character on the part of the promisor;

    (b)    that the promise did induce such action or forbearance; and

    (c)    injustice can be avoided only by the enforcement of the
             promise.

*Eby v. York-Division, Borg Warner,* 455 N.E.2d 623 (Ind.Ct.App. 1983).

14.  In this case, after the City withdrew funding from the project, LCD

made promises to Metro Family that the project would continue forward into the

future (see Factual Finding 36) and that Metro Family would be able to exercise

the Option later.  Those promises were of a type LCD should reasonably expect

to induce Metro Family to allow the destruction of its building on the site at

issue.

15.  Had those promises not been made, Metro Family would have

determined to maintain their current building in its location because it was a

good location for business, because the building had not flooded, and because it

would likely have been allowed to continue to operate in what might otherwise be

a floodplain (because it had been in existence prior to the enactment of certain restrictions on building within a floodplain).

16.  LCD's promises did induce Metro Family to allow its building to be demolished.

17.  In this case, because the Metro Family Property has now been reconveyed to the City, injustice can only be avoided by enforcing the promise.

18.  Under the doctrine of promissory estoppel, Metro Family is entitled to exercise its Option to purchase the Property within eighteen (18) months of the date of this decision.

## Analysis

### (A)   As to Count Two, Breach of Option Contract:

In this case, Metro Family and LCD entered into a contractual relationship as an alternative to the exercise of the power of eminent domain by LCD.  The language in the contract and Option was negotiated by both parties, and each had input as to the final language found in the contractual documents.

At the time that the contractual documents were executed, the parties mutually believed that the City had committed in writing to fund the Levee Project and that there was minimal or no chance that the project would be stopped in mid-stream.  In fact, it could be said that the project had begun, though dirt had not yet been turned.  LCD had written documents from the City committing to fund the project, had substantial funds of their own to contribute to project completion, had actually paid for and obtained plans and specifications to start the project, and actually believed (and believe to this day)

-17-

that the project should be completed.  Metro Family had asked for and received documents confirming the City's agreement to fund the project, was aware that LCD had begun the process of using eminent domain power to obtain this and other real property for the project, and had received from LCD board members and the project manager repeated assurances that the project was to be completed.  In short, at the time the parties executed the documents, the Levee Project had in fact been started because drawings and specifications had been produced and LCD had already exercised its legal right to obtain Property.

Both Metro Family and LCD had some slight reason to consider whether the Levee Project might not be completed.  Metro Family members asked "hundreds of times" if the project was going to be completed.  LCD had received a letter from the City Council members questioning whether the project was being properly managed.  Either party could have suggested specific language to address what would happen to the Metro Family Property if the Levee Project did not come to completion.  However, neither party did suggest such language.  In a perfect world, one party or the other should have suggested such language. Under the facts of this case, however, and based upon both parties' mutual understanding that the City had committed to fund this project, it was understandable and *reasonable* for both parties to have failed to include such a contingency in the final documents.

Therefore, at the time these documents were executed, they did not contain any ambiguity.  Metro Family was entitled to exercise the Option commencing on a date that would be able to be specifically understood by the

-18-

parties, but was flexible enough to accommodate the well-known difficulties of predicting precisely when a major construction project will be completed.

It was only after the execution of the contractual documents that an event outside the control of either of the parties occurred which caused an ambiguity to arise in the execution of contractual duties.  That event was the City's decision to withdraw from its prior commitment to fund the Levee Project.  LCD did not have sufficient funds of its own at that time to fund the project.  For political reasons having to do with a desire not to substantially raise its own tax rates, and to avoid a confrontational relationship with the City itself, LCD did not either complete the project itself or attempt to force the City to re-fund the project.

The City's actions created an ambiguity within the contract as to whether and when Metro Family might exercise the Option it received to repurchase its Property.  When faced with a latent ambiguity which arises not on the face of the documents, but arises out of an attempt to execute the contract itself, Indiana courts may consider extrinsic evidence to determine the intent of the parties.

After hearing all the evidence the Magistrate Judge concludes that when the documents were signed, Metro Family intended to be able to return to the Property if the Levee Project was not completed because it was a good location to do business and the building itself had never flooded before, even without a levee.  The Magistrate Judge concludes that when the documents were signed LCD took this Property only for the sole purpose of creating the levee.  There is no evidence before the Magistrate Judge that LCD took it for any other general

flood control purpose.  Therefore, if the Levee Project did not come to fruition, the intent of LCD at the time the contractual documents were signed would have been to return the Property to Metro Family by allowing them to exercise the Option, and that the Option would have to be exercised within eighteen (18) months of the time LCD decided not to proceed with the project.

In this case, the evidence establishes that LCD has always wanted the Levee Project to go forward and held out hope that it would be completed for a considerable period of time after the City withdrew its funding.  It completed plans for the project even after the City withdrew funding.  LCD represented to Metro Family that there was time in the future in which the Option could be exercised.  LCD's final decision to abandon the project came when it conveyed its interest in the Metro Family Property to the City.

The Magistrate Judge, therefore, concludes that Metro Family has proven: (1) the existence of an Option contract; (2) that the contract contained a latent ambiguity; (3) that the intention of the parties was to allow Metro Family to exercise the Option if the Levee Project was not completed; (4) that LCD breached the Option contract by refusing to allow Metro Family to exercise the Option within eighteen (18) months of LCD's final decision not to proceed with the project, which in this case is its decision to convey the Property to the City.

In order to recover on its breach of contract case, Metro Family must establish that it was damaged.  In this case, the Magistrate Judge finds that Metro Family has not proven monetary damages.  The testimony of the expert

witness tendered by Metro Family is too speculative to base any opinion about what the fair market value of the Metro Family Property is or was, or to establish with any certainty the amount of any income stream lost from an inability to exercise the Option.  That being said, the Magistrate Judge does not believe that LCD's payment of $417,000 reflected the complete fair market value of taking this Property.  While the precise dollar value of the Option can be debated, the evidence before the Magistrate Judge is that the parties to this contract freely bargained for the Metro Family Property and came to the conclusion that the value of the Property was $417,000 *plus* the right to exercise the Option.  Metro Family has established that it has been damaged by being unable to exercise its Option.

By failing to place into evidence the specific monetary value of the Option, has Metro Family then failed in its burden of proving damages?  The Magistrate Judge concludes that the answer to this question is "No," because Indiana courts do recognize that in rare and extraordinary circumstances the remedy of "reformation" can come into play.  Reformation can only be employed when a mutual mistake of fact has occurred.  Here, this court has concluded that mutual mistake was made, and reformation of the contract is a proper remedy. The Option is reformed only to the extent that Metro Family may exercise it within eighteen (18) months of the date of this order – that being the date that this court has concluded that Metro Family was, in fact and law, entitled to exercise the Option if the Levee Project did not occur.

**(B)    As to Count Three, the Claim of Promissory Estoppel:**

Indiana recognizes an equitable contractual doctrine of promissory estoppel.  Because the claim sounds in contract and not tort, no notice of tort claim is required before the claim may be brought in court.

Here, any promises made by LCD prior to the execution of the Option contract itself would not fall within the doctrine of promissory estoppel, but rather must be analyzed under the contract.  However, in this case there were promises made by LCD *after* the execution of the contract which may be subject to this doctrine.  Specifically (at Factual Findings 33, 35, and 36), after the City withdrew funding for the Levee Project, LCD represented that the Levee Project would proceed into the future and that Metro Family would be entitled to exercise its Option later.  In reliance on these promises, Metro Family allowed its building to be torn down.

The Magistrate Judge believes that but for the promises of LCD made after the City had withdrawn funding but before the building had been demolished, Metro Family would have sought to keep the building in place and the business in operation.  This is because this Property was a good location for business and because the building itself had never flooded.  The loss of the building and ability to continue into operation in the future is damage.  While Metro Family has not provided sufficient evidence of the monetary value of that damage, it should be entitled to some remedy.  Under the doctrine of promissory estoppel, that remedy is to enforce the promise.  Metro Family should now be allowed to exercise the Option if it chooses to do so, and it must do so within a reasonable time from the

-22-

date of this order.  In keeping with the findings on the breach of contract claim, that time period is eighteen (18) months.

## Decision

Judgment shall enter in this case as to Counts Two and Three of the plaintiffs' Second Amended Complaint that this court declares that plaintiff Metro Family LLC is entitled to exercise the option contained in the Option contract signed November 30, 2001, within eighteen (18) months commencing May 1, 2009.

As previously determined, the plaintiffs' claims under Count Four of the Second Amended Complaint are dismissed.  (See Docket No. 111).  The parties have advised the court that they have resolved their dispute under Count One.  (See Docket No. 132).  It appearing that all matters in dispute are now resolved, there is no just reason for delay and a final judgment shall now enter.

**SO ORDERED.**

**Entered:**  May 1, 2009

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

Richard A. Butler
rabutler9@comcast.net

William C. Moyer
LORCH & NAVILLE, LLC
wmoyer@lorchnaville.com

Joshua Taylor Rose
FROST BROWN & TODD, LLC
jtrose@fbtlaw.com

Joseph Wilber Votaw III
VOTAW & KISOR
josephvotaw@earthlink.net

Susan Lynn Williams
FROST BROWN & TODD LLC
swilliams@fbtlaw.com